HARDY, Judge.
This is a compensation suit in which plaintiff claims to have been totally and permanently disabled by injuries received in an automobile accident while in the course and scope of his employment by Lewis & Maxwell Lumber Company which operated a mill in or near Pollock, Grant Parish, Louisiana. The defendant,. Consolidated Underwriters, is the compensation insurance carrier for said named employer. After trial there was judgment, supported by written reasons assigned by the trial Judge, in favor of plaintiff awarding compensation in the amount of $30 per week for a period not exceeding four hundred weeks, together with the sum of $500 to be applied to medical and hospital bills. From this judgment the defendant has appealed.
This case involves the determination of two purely factual issues: first, the question as to whether plaintiff at the time of the accident was acting within the course and scope of his employment, and, second, the question as to the nature and extent of plaintiff’s injuries and disability. Both of these propositions are presented by the defense urged, which is predicated upon the contentions that plaintiff was not in the course and scope of his employment at the time of the accident and that he did not sustain injuries of such nature and degree as have resulted in total and permanent disability.
Plaintiff was employed, as a sawyer and millwright, by the Lewis & Maxwell Lumber Company which operated a small sawmill. In addition to the performance of his duties during the usual five-day work week the record conclusively establishes the fact that plaintiff was accustomed to spend Saturdays and Sundays, or an appreciable part thereof, in making repairs and generally conditioning the mill for the continuance of its operation during the following week. Unquestionably plaintiff was in charge of procuring or making repairs and installing necessary parts. Additionally, it is claimed by plaintiff that he was charged with the responsibility of hiring other needed employees and there is considerable testimony in the record to the effect that plaintiff was possessed of the authority to hire and fire. Our study of the testimony in the record convinces us that although plaintiff might have been classified as a sawyer or millwright, his capacity was actually that of a superintendent, and he performed the duties of such a position under the direction of either Lewis or Maxwell, or, on occasion, independently and on his own authority.
In support of this conclusion the testimony of numerous witnesses is clearly to the effect that, among the other duties above noted, plaintiff on occasions had sold and filled orders for lumber; had inspected and appraised machinery for use at the mill; had interviewed and hired employees of the mill; had driven the company truck on errands in connection with his own employment, among which 'were transportation of parts and equipment and of a sawfiler whom he employed at such times as necessary to keep the saws in condition, and other similar related matters.
It is vigorously contended by defendant that practically all of, these duties were performed under the eye, or in the pres *266 ence, or by specific direction of one or the other of the partners owning the mill. We concede the correctness of this contention, but we think the record amply establishes the fact that the range and latitude of plaintiffs duties constituted a very definitely implied authorization for him to do and perform such acts and service as in his judgment might be to the interest of the mill operation.
Proceeding to a discussion of the facts surrounding the accident and injury, it is shown that on the morning of Saturday, November 26, 1949, plaintiff took one of the company trucks and drove to the home of a friend, Raymond Griffin, who lived some twelve or fifteen miles from Pollock. After spending some forty minutes, more or less, at Griffin’s home plaintiff returned to Pollock and in the outskirts of the town was involved in a collision, as the result of which he sustained the injuries which will be hereinafter considered.
It is obvious that the question as to the course and scope of plaintiff's employment at the time of the accident must turn upon the purpose of his visit to Griffin. If plaintiff was simply making a social call, or if his visit was entirely personal in nature, it follows that he could not have been considered to have been acting in the course and scope of his employment, and, accordingly, his claims must fail. But if plaintiff was making the trip in the interest of his employers and in connection with the course and scope of the duties of his employment, then clearly he is entitled to compensation.
Plaintiffs own story as to the purpose of his trip is that he wished to contact Griffin to inquire about an edgerman who would be available for employment. Plaintiff contends that the edgerman, at the time employed by the mill, had indicated that he intended to quit his employment sometime before the first of the year, and it was for this reason that he was interested in lining up a replacement. In this connection it is established without controversion that Griffin was a friend of plaintiff who worked for another lumber company and who was in contact with numerous sawmill workers in the vicinity. It appears that plaintiff on previous occasions had consulted with Griffin with respect to employees for the Lewis & Maxwell mill. An additional purpose of the visit to Griffin, according to plaintiff, was the procurement of a three-quarter inch bolt with which plaintiff intended to replace a three-eighths inch bolt in the feed-works of the mill machinery. This replacement was desirable, in the judgment of plaintiff, although there is no indication that the mill did not continue to operate with the smaller bolt. The uncontra-dicted testimony of plaintiff is to the effect that he had noticed the exact kind of bolt he wished to procure lying in Griffin’s yard on the occasion of a visit about a week before the time of the accident.
Plaintiff had spent some time at the mill on the morning of November 26th in repairing the feed-works in order to get the machinery into condition for operation on Monday morning. Another significant fact, which is established by the testimony in this connection, is that Lewis had instructed plaintiff on Friday to get the mill ready for operation Monday morning because it would be necessary for them to saw more lumber that week than had been done the preceding week. Lewis also advised plaintiff that he was going to be away from the mill, since he proposed to attend a football game on Saturday.
Defendant attacks plaintiff’s asserted reasons for his visit to Griffin first on the ground that the edgerman, one Willie Gray, had not told Smith that he intended to quit, and, second, that the necessity for the replacement of the bolt was not established and the bolt was not found either on plaintiff’s person or at or about the scene of the accident subsequent to its occurrence. This latter conclusion is so strained and illogical as to merit little, if any, consideration. Nobody knew anything about the bolt except Smith and Griffin and, consequently, in view of the plaintiff, Smith’s serious injuries, there would have been no effort, and the record does not disclose that there was any effort, made to locate the bolt. The testimony of other witnesses who were tendered on behalf of plaintiff shows that they had been in Smith’s company immediately before he left Pollock on the trip to *267 Griffin’s home and that he had mentioned the fact that he was going to see about laborers for the mill.
With respect to the contention that Gray did not intend to quit work, we can only say that the testimony establishes the fact that Gray had discussed, in Smith’s hearing, with other employees the fact that he would like to go into the woods and use a power saw. Admittedly the mill was small, its employees few, and as a consequence plaintiff, who is conclusively shown to have been zealous in the performance' of his duties in the interest of his employer, must be considered to have been “taking time by the forelock” and making preparations to secure a replacement of the edgerman if, when and as he might determine to give up his job. Such action was certainly commendable in purpose and we do not think the uncertainty of Gray’s intention should militate against the sincerity and good faith of the plaintiff’s action.
We perceive nothing in plaintiff’s explanation of his visit to Griffin that is inconsistent with or foreign to his employment. On the contrary, we are convinced that the trip was made in the interest of his employers and for legitimate purposes in the course and scope of his employment. No substitute purpose for the visit is urged by way of defense and it would be difficult for us to consider that plaintiff had driven twelve or fifteen miles simply for the purpose of drinking a cup of coffee and chitchatting with his friend, Griffin. The testimony of both plaintiff and Griffin is positive as to their discussion of available laborers and of the bolt.
Reverting to further consideration of plaintiff’s duties we are impressed with the testimony of Mr. Lewis which we quote, with our supplied emphasis, as follows:
“Q. Mr. Lewis, where do you live? A. In Pollock, Louisiana. .
“Q. What is your occupation? A. Sawmill operator.
“Q. In Pollock? A. Yes, sir.
“Q. What is the name of your business? A. Lewis & Maxwell Lumber -Company.
“Q. Have you employed the plaintiff, Mr. Smith, in your operation? A. Yes, sir.
“Q. What was his job? A. He was hired as sawyer.
“Q. Now, specifically, what were his duties as a sawyer? A. Well, in our operation, it is small. In a small operation, the sawyer is the highest paid man and he is sort of boss, you might say. And in this instance, Mr. Smith was to keep the mill running, millwright work. In other words, he was in control of the actual sawing operation, and he directed the edgerman and that kind of personnel by virtue of his job. All the men working there that — when the mill is operating — that in a small operation, they look to the sawyer as the boss.
“Q. Did his authority go beyond the mill ? In other words, did he have authority over anyone outside of the mill? A. So far as the woods concerned, no. The logging.
“Q. Did he have any authority over the truck drivers? A. No.
“Q. Or the trucks? A. No.
“Q. Did Mr. Smith have the right to hire and fire without ycncr or Mr. Maxwell’s consent? A. Well, that is a hard question. As I said this is a small operation and your few men more or less work together, and if we needed someone — on several occasions I have told Mr. Smith— He knew where he worked before where possibly he could get someone, and told him if we can get them, let’s hire them.
“Q. Mr. Smith remembered, two specific occasions in which he hn'cd men. Mr. Willie Gray was one and Mr. Lacroix was another. Would you say in those instances were of the type of employment you were talking about. In other words, when he went out. and got those ? A. In those particular instances — In the case of Willie. Gray, he had worked for, us before and needed an edgerman. He wasn’t working, and I probably said, ‘Go over and get Willie and see if he will work’. And in the case of Lacroix, his cousin, Lonnie. -V. worked for us awhile. He had told. Smith his cousin was a block setter and he done *268 it with Corrall and how about him, and we said, ‘Sure, we need a block setter. If he will work for us, go hire him’. I believe at that time he had a job at the gravel pit or ■something.
“Q. In each of these instances, Mr. Smith was not working independently, but he knew you would give your consent because you needed the man? A. It was a cooperative arrangement.
“Q. Did he have authority to hire and fire just independently without your knowledge and just act arbitrarily and without consulting you whatsoever? A. Well, put it like this. If Mr. Maxwell and I were gone and someone didn’t show up for work and someone came by after a job, sure he could hire them and put them in that place.
• “Q. That would be only where it would be necessary to run the mill? Have to be an emergency ? A. Yes, generally.
“Q. Could he hire somebody where the job was to be fulfilled was not there to be filled? A. Generally, all hiring was done with our consultation.
“Q. Can you recall any occasion where Mr. Smith hired a man without your knowledge or consent? A. Well, I can’t offhand recall that, no.

“Q. Was Mr. Smith authorised to use the trucks, drive the trucks himself ? A. We sent him on different errands. Well, possibly cases came up in maintenance of the mill where he had to have transportation that he might have taken the truck and nothing was said.”

Careful study of the above testimony appears to us to be completely convincing, and it is to be observed in the testimony of the witnesses, which was given with fairness and frankness, that he not only did not deny plaintiff’s authority to do the acts for which plaintiff contends in support of his claim, but, on the contrary, so qualified his testimony as to leave the clear implication that plaintiff’s authority along the lines discussed in the testimony was general and understood. Particularly is it noted that the witness considered in the -event of the absence of himself and Mr. Maxwell that plaintiff was left in charge and was authorized to do whatever his judgment might indicate.
Surely in the light of this testimony any doubt must be resolved in favor of plaintiff’s contentions.
As the result of our consideration of the facts outlined we are convinced that plaintiff’s authority comprehended the duty of performing services of the nature in which he claims he was engaged at the time of the accident. Nor do we feel that defendant has successfully borne the burden of contradicting plaintiff’s explanation of his purpose in making the trip upon which he was engaged.
There is little dispute evidenced by the record as to the serious nature of the injuries sustained by plaintiff, which were concussions of the head, fracture of the right clavicle, multiple fractures of eight ribs, injury to the left shoulder and hand, together with various and sundry contusions, both internal and external. The record shows that plaintiff has expended, or is obligated, to expend something in the neighborhood of $2,000 for hospitalization and treatment.
Defendant urges that plaintiff has or will, according to some of the medical testimony, effect a satisfactory recovery from his injuries. Certainly, this is sincerely to be hoped, but so far as the record indicates it was, at the time of trial, merely a hope. The district Judge had no apparent difficulty in arriving at the conclusion that plaintiff was totally and permanently disabled at the time of trial and in this finding, after thorough examination of the record, we fully concur.
For the reasons assigned the judgment appealed from is affirmed at appellant’s cost.